UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00113-GNS

ST. CATHARINE COLLEGE, INC.                                              PLAINTIFF

v.

JOHN B. KING, JR., in his Official Capacity
as Acting Secretary of the United States
Department of Education; and
KATHY FEITH, in her Individual Capacity
as an employee of the United States
Department of Education                                                  DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions to Dismiss (DN 24, 35). For the reasons stated below, the motions are **GRANTED**.

### I.    STATEMENT OF FACTS

This lawsuit arises from claims asserted by Plaintiff Saint Catharine College ("SCC" or "the College") against the Department of Education ("DOE") and its personnel arising from the alleged illegally withholding of federal student aid. (Compl. ¶¶ 1-2, DN 1). Until it ceased operations in July 2016, SCC was a private college located in central Kentucky accredited by the Southern Association of Colleges and Schools Commission on Colleges ("SACS"). (Compl. ¶ 14). During the relevant time period, SCC was provisionally certified to participate in relevant federal student aid ("FSA") programs under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1001 *et seq.* (Compl. ¶ 16).

In January 2012, SCC entered into a Program Participation Agreement ("2012 PPA") with the DOE.[1] (Compl. ¶ 21). The 2012 PPA incorporated the then-current version of 34 C.F.R. § 600.20 in a "Substantial Changes Provision." (Compl. ¶¶ 22-25). Both the 2012 PPA and 34 C.F.R. § 600.20 required SCC to obtain the Secretary's approval to "[a]dd a location at which the institution offers or will offer 50 percent or more of an educational program . . . ."[2] 34 C.F.R. § 600.20(c)(1) (2012).

Between 2011 and 2014, SCC added five new bachelor programs: (1) Bachelor of Science on Radiation Therapy; (2) Bachelor of Science in Radiologic Technology; (3) Bachelor of Art in Farming and Ecological Agrarianism; (4) Bachelor of Science in Farming and Ecological Agrarianism; and (5) Bachelor of Science in Athletic Training (collectively, "the 2011-2014 programs"). (Compl. ¶¶ 20, 26-28). Following the addition of these programs, in June 2014, SCC timely applied for recertification with the DOE, and a School Participation Team based in the DOE's Kansas City school participation division ("KCSPT") conducted site visits in January and February 2015. (Compl. ¶ 32).

During the first site visit, the DOE advised SCC that it would be subject to "heightened cash monitoring" ("HCM-2") pursuant to 34 C.F.R. § 668.162(d). Heightened cash monitoring requires a participating institution to disburse FSA funds to students and seek reimbursement from the DOE, instead of the standard funding protocol under which the DOE provides the funds directly to the students. *See* 34 C.F.R. § 668.162(d). Within months of the site visits and SCC's

---

[1] As a requirement of its participation in the Federal Perkins Loan program, SCC had to complete a PPA. *See* 34 C.F.R. § 674.8.
[2] This language is significant in light of the current version of Section 600.20, which requires SCC to obtain the Secretary's approval to "[a]dd *an educational program or* a location at which the institution offers or will offer 50 percent or more of an educational program . . . ." 34 C.F.R. § 600.20(c)(1) (emphasis added). The Program Participation Agreement that the parties entered into in 2016 ("2016 PPA") contains the same requirement. (Compl. ¶ 151).

2

placement on HCM-2, SCC replaced its President, its entire senior leadership team, substantially all of the staff in the business and financial aid offices, and a Director of Compliance position. (Compl. ¶ 34).

Defendant Kathy Feith ("Feith") is a program reviewer with the DOE. (Compl. ¶ 35). Following the site visits, she advised SCC that the DOE "considered [the 2011-2014 programs] to fall within the scope of the 2012 Substantial Changes Provision." (Compl. ¶ 35). As alleged by SCC, it explained why the 2011-2014 programs were not a substantial deviation from SCC's already established educational programs, but Feith requested documentation showing that SACS had approved the 2011-2014 programs. (Compl. ¶¶ 37-38). SCC provided a letter from SACS to the DOE explaining that the 2011-2014 programs were within SCC's accreditation, but Feith was not satisfied with this letter because it did not contain the specific dates that the 2011-2014 programs were approved. (Compl. ¶¶ 38-39). SCC then provided another letter from SACS "explaining in detail the accreditation process and that neither SACS nor SCC considered the [2011-2014 programs] to be a substantial change from SCC's educational programs, and identifying the dates that each of the [2011-2014 programs] was approved." (Compl. ¶ 39).

The DOE then convened a panel in the summer of 2014 to review the eligibility of the 2011-2014 programs. (Compl. ¶¶ 41-42). Feith asserted that she would argue SCC's case regarding the 2011-2014 programs; SCC requested permission to attend the hearing, which Feith denied. (Compl. ¶ 42). On July 27, 2015, the DOE's Kansas City school participation division alerted SCC that it "had rejected SCC's efforts to satisfy [the DOE's] . . . demand to obtain the Secretary's approval" for the 2011-2014 programs. (Compl. ¶¶ 43-44). The director of the DOE's Kansas City school participation division also carbon-copied this statement to SACS and to the Kentucky Council on Postsecondary Education. (Compl. ¶ 44).

Beginning in April 2015, SCC began submitting reimbursement requests to the DOE in accordance with its placement on HCM-2. (Compl. ¶ 49). Per Feith's directive, SCC did not request reimbursement for students enrolled in the 2011-2014 programs. (Compl. ¶ 49). On April 16, 2015, SCC submitted its first request for $253,288 in FSA. (Compl. ¶ 52). The DOE initially rejected the entire amount, citing four reasons for the rejection, including failure to make the required monetary match of the Federal Supplemental Educational Opportunity Grant program ("FSEOG"). (Compl. ¶ 54). SCC addressed these issues and resubmitted the request. (Compl. ¶ 54). The DOE reimbursed SCC for all but $5,500 of the requested funds for two students coded as majors of a pre-2011-to-2014 program, e.g., pre-Athletic Training. (Compl. ¶ 55).

On May 21, 2105, SCC made a second submission for FSA funds in the amount of $601,384. (Compl. ¶ 59). The DOE paid a portion of the submission, but denied the portion associated with: (1) students who were "formally undecided but interested in one of the [2011 to 2014 programs]"; and (2) students who were coded as a "pre-" some program other than the 2011 to 2014 programs, e.g., pre-Nursing. (Compl. ¶ 65). SCC alleges that this constituted a departure from the April 2015 submission in which the DOE reimbursed SCC for FSA funds given to students in these categories. (Compl. ¶¶ 66-67). Ultimately, and with Feith's knowledge, SCC began coding all students previously coded "pre-program" as "undecided." (Compl. ¶ 78).

On July 7, 2015, SCC made a third reimbursement request to the DOE in the amount of $613,183. (Compl. ¶ 79). The DOE paid the requested amount in full, which included reimbursement for FSA given to twenty-eight students coded as "undecided." (Compl. ¶¶ 81-82). On September 3, 2015, SCC made a fourth submission for reimbursement in the amount of

$805,184 to the DOE, which the DOE paid in full. (Compl. ¶¶ 84, 87). The reimbursement included amounts of FSA disbursed to thirty-six students coded as "undecided." (Compl. ¶ 86).

On October 9, 2015, SCC made a fifth submission to the DOE, which included a request for reimbursement in the amount of $741,415 for FSA distributed to thirty-four students coded as "undecided." (Compl. ¶¶ 89, 91). The DOE denied reimbursement in the amount of $182,623 for the thirty-four "undecided" students. (Compl. ¶ 92). The DOE explained that, "[a]ccording to the open program review, there is still an issue with the students in the 'undecided' program. These records have been rejected pending review from the lead reviewer [Feith]." (Compl. ¶ 93 (internal quotation marks omitted)). As alleged by SCC, Feith explained that "she would no longer approve students who were formally undecided but who had, on their enrollment forms, expressed an interest in perhaps someday pursuing one of the 2011 to 2014 Bachelor Programs . . . ." (Compl. ¶ 99). Ultimately, however, the DOE paid the entirety of the fifth submission, explaining that the rejection of reimbursement for the thirty-four "undecided" students "had . . . all been a mix-up . . . ." (Compl. ¶ 103).

On November 18, 2015, SCC sent a sixth submission to the DOE requesting reimbursement in the amount of $869,375. (Compl. ¶ 108). Five days later, the DOE notified SCC that it had been assigned a new payment analyst. (Compl. ¶ 110). The new analyst notified SCC on December 1, 2015, that she required certain documents, and SCC responded that the DOE already had those documents which had been provided for the previous reimbursements. (Compl. ¶¶ 111-112). In response, the DOE notified SCC on December 8, 2015, that it would be conducting an on-site visit for the purpose of reviewing the November 18, 2015, submission. (Compl. ¶ 113). SCC attempted to convince the DOE to begin the site visit in a quicker timeframe than it offered initially, but was unsuccessful. (Compl. ¶¶ 115-117). The site visit

ultimately began on January 11, 2016, and lasted four days. (Compl. ¶ 121). SCC resubmitted the November 18, 2015, submission on January 15, 2016. (Compl. ¶ 122). On February 11, 2016, the DOE paid $320,293 of the $869,375 requested. (Compl. ¶ 123).

There were a number of reasons the DOE cited for the denial of the requested aid, all of which "with a very few possible exceptions," according to SCC were resolved. (Compl. ¶¶ 126-129). These included conflict over FSEOG and federal work study ("FWS") reimbursement, resulting in the loss of $40,000 due to the ending of the FSEOG program for the 2014-2015 academic year, and failure to reimburse SCC for the FWS aid distributed in the 2015-2016 academic year.[3] (Compl.¶¶ 141-149).

On January 19, 2016, SCC and the DOE entered into the 2016 PPA. (Compl. ¶ 150). Following a site visit, the DOE issues a Program Review Report ("PRR"), to which the institution may respond, and ultimately the DOE issues a Final Program Review Determination. (Compl. ¶ 154). As of the filing of the Complaint on February 22, 2016, the DOE had not issued a PRR. (Compl. ¶ 155). On June 1, 2016, SCC announced that it would be closing at the end of the July 2016. (Def.'s Reply Mot. Dismiss Ex. 1, DN 40-1).

The Court has previously denied SCC's motion for preliminary injunction as moot. (Order, DN 44). Defendants have moved to dismiss all claims asserted against them. (Def.'s Mot. Dismiss, DN 24; Def.'s Mot. Dismiss, DN 35).

---

[3] In its response to the DOE's motion, SCC has clarified that its claims in this action "arise solely out of the Secretary's denial of reimbursement of FSA awarded to students in or related to the Five Academic Programs (*i.e.*, not FSEOG or FWS)." (Pl.'s Resp. Def.'s Mot. Dismiss 11 n.32, DN 38).

## II.     JURISDICTION

This action arises under the laws of the United States and the Court has jurisdiction under 28 U.S.C. § 1331.

## III.     STANDARD OF REVIEW

The standards for dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) differ in the Sixth Circuit. *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Threshold challenges to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) should generally be decided before any ruling on the merits under Fed. R. Civ. P. 12(b)(6). *See Bell v. Hood*, 327 U.S. 678, 682 (1946). In most circumstances, a plaintiff bears the burden to survive Fed. R. Civ. P. 12(b)(1) motions to dismiss for lack of subject matter jurisdiction. *See id.*

Challenges to subject matter jurisdiction come in several varieties. Facial attacks challenge a plaintiff's establishment of jurisdiction in their complaint and require the court to examine the jurisdictional basis. *See United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citation omitted). Factual attacks contest the existence of factual prerequisites to jurisdiction. *See id.* In such motions, in contrast to motions under Fed. R. Civ. P. 12(b)(6), the district court is empowered to resolve the factual disputes affecting any jurisdictional prerequisites. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986). A plaintiff bears the burden in both of these situations. *See Bell*, 327 U.S. at 682.

Sovereign immunity may also serve as a basis for a Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of jurisdiction. *See Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 671 (6th Cir. 2013). "'[W]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power,' the defense 'is not coextensive with the limitations on judicial power in Article III.'" *Nair v. Oakland Cty. Cmty. Mental Health Auth.*, 443 F.3d 469,

474 (6th Cir. 2006) (citing *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998)). "[U]nlike subject-matter jurisdiction, 'the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity.'" *Id.* (citation omitted).

Courts analyzing challenges under Fed. R. Civ. P. 12(b)(6) "must construe the complaint in the light most favorable to plaintiff[] . . . ." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted). Courts must also accept all of a plaintiff's allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements" are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, this standard is satisfied when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

## IV. DISCUSSION

### A. Feith's Motion to Dismiss

A complaint will be dismissed when it "fail[s] to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). Considering motions under Rule 12(b)(6) requires the Court to construe the complaint in the most favorable light for the nonmoving party, accepting "as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994) (citation omitted). While the pleadings need not contain detailed factual allegations, the nonmoving party must allege facts that when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In Count III of the Complaint, SCC asserts a claim for monetary relief against Feith pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny.[4] (Compl. ¶ 172). In seeking to dismiss this claim, Feith asserts that: (i) SCC has a remedy under the APA, and the Court should decline "to extend *Bivens* to Department of Education employees who review institutions of higher education for purposes of Title IV funding"; and (ii) SCC's claim against her are barred by qualified immunity. (Def.'s Mem. Supp. Mot. Dismiss 2, DN 24-1 [hereinafter Feith's Mot.]).

### 1. *Bivens* Remedy

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). As the Sixth Circuit has noted, *Bivens* "claims are the counterpart to suits under 42 U.S.C. § 1983 against state officials who infringe plaintiffs' federal constitutional or statutory rights." *Vector Research, Inc. v. Howard & Howards Attorneys P.C.*, 76 F.3d 692, 698 (6th Cir. 1996) (citations omitted). "A *Bivens* remedy is available only if (1) there are no 'alternative, existing process[es]' for protecting a constitutional interest and, (2) even in the absence of an alternative, there are no 'special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Left Fork Mining Co. v. Hooker*, 775 F.3d 768, 774 (6th Cir. 2014) (alteration in original) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

---

[4] If SCC had asserted a claim for monetary damages against the DOE for violations of its constitutional rights, this Court would lack subject matter jurisdiction. *See Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 425 (6th Cir. 2016) (citations omitted).

9

### a. Availability of Alternative, Existing Processes

The Court must initially determine whether there is an existing process to provide relief to SCC. As the Sixth Circuit has noted, "[t]he [Supreme] Court has not created additional *Bivens* remedies where the design of a government program suggests that Congress provided what it considered adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Jones v. Tenn. Valley Auth.*, 948 F.2d 258, 263 (6th Cir. 1991) (citing *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)). As a sister court has noted, "[t]he case law is replete with cases concluding that the availability of an administrative process to address a plaintiff's complaint regarding an agency action, such as termination of benefits or incorrect calculations of sums due, precludes a *Bivens* action." *LaMarca v. United States*, 34 F. Supp. 3d 796, 808 (N.D. Ohio 2014) (citing *Chilicky*, 487 U.S. at 412). *See also Topping v. U.S. Dep't of Educ.*, 510 F. App'x 816, 819 (11th Cir. 2013) ("[W]e [have] held that a former employee of the Department of Agriculture could not sue for money damages for wrongful termination under *Bivens* where he had a right to judicial review under the Administrative Procedures Act." (citing *Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416-17 (11th Cir. 1998))).

In this case, Feith argues that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides an adequate remedy to preclude relief in this forum. (Feith's Mot. 9-10). The Court agrees and finds the reasoning and the holding in *LaMarca v. United States* instructive. In *LaMarca*, the plaintiffs were privately owned for-profit corporations operating cosmetology schools and the individual shareholders of those corporations. *See LaMarca*, 34 F. Supp. 3d at 797. In the 1970s, the schools became participants in the Pell Grant program as part of the HEA. *See id.* at 799. Due to difficulties arising from the transition of the Pell Grant application process from paper to electronic form, the DOE failed to forward approximately $600,000 in funds owed

to the schools for the period of 1998-2000. *See id.* During that same period, the corporations owed approximately $430,000 in Pell Grant refunds to the DOE for students who had dropped out before completing their coursework or who were later determined to be ineligible for Pell Grants. *See id.* The schools alleged that the DOE's failure to pay Pell Grant funds to them resulted in cash flow issues and asserted that they were entitled to offset any refund owed to the DOE against the funds owed from the DOE. *See id.*

The DOE's Office of Inspector General ("DOE-IOG") conducted an unannounced inspection of the schools' records in October 2000, which the plaintiffs maintained was due to their complaints about funds owed. *See id.* The plaintiffs alleged that DOE officials allegedly targeted and unfairly treated any cosmetology schools which converted to a credit-hour program and that they were targeted after they received approval to make that change from their accrediting agency. *See id.* Part of that unfair treatment allegedly involved the use of a program review of the schools and their placement on a reimbursement format. *See id.* Under the reimbursement format, the DOE would only pay Pell Grant funds after the students completed the coursework rather than at the commencement of the academic term. *See id.* at 799-800. A DOE official attributed the imposition of the reimbursement format to the schools' failure to refund funds from withdrawn students from the 2001-2002, and the 2002-2003 academic years. *See id.* The same official also required the schools to return all Title IV refunds due after July 1, 2000, before the DOE would make any future Pell Grant fund disbursements. *See id.* The schools then engaged in a letter-writing campaign to various political officials, which allegedly upset a DOE official. *See id.*

In July 2003, the schools submitted a reimbursement request for Pell Grant funds from the 2003-2004 school year in which they estimated that the DOE owed them about $500,000 in

Pell Grant funds for seven months of the year. *See id.* After the CEO of the schools erroneously certified that all Title IV refunds had been made as part of the request, the DOE-IOG initiated a criminal investigation of the CEO that led to his indictment but ultimate acquittal. *See id.* at 800-02. In September 2003, the DOE issued a preliminary program review ("PPR") relating to the prior inspection of the schools' records, and the PPR referenced the unpaid refunds owed to the DOE. *See id.* at 800.

As part of the criminal investigation, the schools' records were seized in October 2003. *See id.* at 801. The seizure of the records allegedly prevented the schools from responding to the PPR and receiving re-accreditation. *See id.* In December 2003, the schools closed, which they attributed to their financial difficulties, their inability to complete the re-accreditation review, and their inability to respond to the PPR. *See id.*

The plaintiffs then filed suit against the United States and certain DOE officials seeking a declaration that the DOE breached its contractual obligations to them and the defendants violated the HEA. *See id.* at 802. The plaintiffs also requested, *inter alia*, an order directing the DOE to pay the schools for Pell Grant funds for the 1998-1999 academic year. *See id.* The plaintiffs further asserted Bivens claims against the DOE officials in their individual capacities on the bases that they violated the plaintiffs' constitutional rights relating to the schools' involvement in and compliance with the requirements of the Pell Grants program, and because of the CEO's criminal prosecution. *See id.* at 807. The defendants moved to dismiss all claims under Rule 12(b)(1) and 12(b)(6). *See id.* at 803-09.

As to the individual defendants, the court considered whether the plaintiffs had stated a viable *Bivens* claim. The court stated that "[t]he case law is replete with cases concluding that the availability of an administrative process to address a plaintiff's complaint regarding an

agency action, such as termination of benefits or incorrect calculation of sums due, precludes a *Bivens* action." *Id.* at 808 (citation omitted). Analyzing the first factor, the court noted:

> [The] final agency action is reviewable by the courts pursuant to the provisions of the APA. The availability of an administrative remedy—even an administrative remedy that may not provide complete relief as in *Wilkie* and *Chilicky*—precludes a *Bivens* action. Congress has provided a comprehensive statutory scheme for addressing claims under the HEA and provided no private right of action or judicial review outside of the APA.

*Id.* at 809. On that basis, the court dismissed the claims against the individual defendants. *See id.*

The reasoning of *LaMarca* applies to the present case. While the case *sub judice* involves the Perkins Loan program rather than the Pell Grants program at issue in *LaMarca*, both federal loan programs are governed by the same general administrative regulations found in 34 C.F.R. Part 668. *See* 34 C.F.R. § 668.1 ("This part establishes general rules that apply to an institution that participates in any student financial assistance program authorized by Title IV of the Higher Education Act of 1965, as amended (Title IV, HEA program)."); 34 C.F.R. § 668.1(c)(1), (10) (stating that the general regulations applicable to the Title IV, HEA programs apply to federal loan programs including "[t]he Federal Pell Grant Program"; and "[t]he Federal Perkins Loan Program . . . ."). Because the HEA provides a comprehensive remedy for addressing SCC's claims, SCC has no private cause of action or a right of judicial review outside of the APA. *See LaMarca*, 34 F. Supp. 3d at 809. Thus, SCC cannot satisfy the first factor, which warrants dismissal of its claim against Feith.

13

### b. Existence of Special Factors Counseling Hesitation

Because the Court has concluded that Plaintiff has failed to meet the first *Bivens* step, consideration of the second part of the analysis is not required. Nonetheless, the second step also mandates dismissal.

Under the second prong of a *Bivens* claim, this Court must consider whether special factors exist that counsel hesitation based on the facts of this case. *See Wilkie*, 551 U.S. at 550. As one circuit judge recently noted regarding litigants' unsuccessful efforts to expand the *Bivens* remedy:

> [T]he [Supreme] Court has grown wary of implied rights of action over the last three decades. That has been true of statutory cases. *See Alexander v. Sandoval*, 532 U.S. 275, 287, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 164-65, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). And that has been especially true of constitutional cases. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3, 122 S. Ct. 515, 151 L. Ed. 2d 456 (2001). Since 1980, the Court has rejected every effort— "more than a dozen" by one count, *Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (en banc)—"to extend *Bivens* liability to any new context or new category of defendants." *Malesko*, 534 U.S. at 68, 122 S. Ct. 515. As that track record suggests, the Court sees implied constitutional rights of action as "unjustified" in "most instances."

*Koprowski v. Baker*, 822 F.3d 248, 261-62 (6th Cir. 2016) (Sutton, J., dissenting) (quoting *Wilkie*, 551 U.S. at 550). "The [Supreme] Court has not created additional *Bivens* remedies where the design of a government program suggests that Congress provided what it considered adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Jones v. Tenn. Valley Auth.*, 948 F.2d 258, 263 (6th Cir. 1991) (citing *Chilicky*, 487 U.S. at 423); *see also Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 431 (6th Cir. 2016) ("[S]ince deciding *Carlson* [*v. Green*, 446 U.S. 14 (1980),] in 1980, the Supreme

Court has 'consistently refused to extend *Bivens* liability to any new context or new category of defendants.'" (quoting Carlson, 446 U.S. at 68)).

In light of the Supreme Court's clear unwillingness to extend the availability of a *Bivens* claim, the Court finds that there is no basis for extending *Bivens* to the circumstances of this case. The Court is persuaded by the reasoning in *LaMarca*, which involved similar circumstances, and that court's decision to decline to recognize a *Bivens* claim for an alleged violation of the HEA. Accordingly, the Court will grant Feith's motion to dismiss the *Bivens* claim asserted against her.

### 2. *Qualified Immunity*

Alternatively, Feith seeks dismissal of SCC's claim against her on the basis of qualified immunity. In light of the Court's determination that SCC has failed to state a *Bivens* claim against Feith, it is unnecessary to consider the defense of qualified immunity.

### B. United States' Motion to Dismiss

In the Complaint, SCC seeks a declaratory judgment and injunctive relief against the DOE.[5] (Compl. ¶¶ 156-170). In moving to dismiss SCC's claims, the DOE maintains that this Court lacks subject matter jurisdiction over SCC's claims and that SCC has failed to state a claim against the DOE. (Def.'s Mem. Supp. Mot. Dismiss 9-14, 18-19, DN 35-1).

Under Rule 12(b)(1), a party may file a motion asserting "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is always a threshold

---

[5] The Court must also be mindful of 20 U.S.C. § 1082(a)(2) which provides that "no . . . injunction . . . shall be issued against the Secretary or property under the Secretary's control and nothing herein shall be construed to except litigation arising out of activities under this part from the application of sections 509, 517, 547, and 2679 of Title 28 . . . ." 20 U.S.C. § 1082(a)(2). *But see Calise Beauty Sch., Inc. v. Riley*, 941 F. Supp. 425, 428 (S.D.N.Y. 1996) ("Although Section 1082 prohibits all injunctive relief that would interfere with the ordinary administrative functions of the Department of Education, it does not protect the Secretary from being enjoined when he exercises powers that are clearly outside of his statutory authority.").

determination." *Am. Telecom Co., L.L.C. v. Republic of Leb.*, 501 F.3d 534, 537 (6th Cir. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). It "may be raised at any stage in the proceedings . . . ." *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008). *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

    1. *Immunity*

"'The United States, as sovereign, is immune from suit save as it consents to be sued . . . .' This principle extends to agencies of the United States, as well, which are immune absent a showing of a waiver of sovereign immunity." *Whittle v. United States*, 7. F.3d 1259, 1262 (6th Cir. 1993) (internal citation omitted) (citing *United States v. Testan*, 424 U.S. 392 (1976)). Under the APA, there is a limited waiver of the government's sovereign immunity to consider final agency actions. *See* 5 U.S.C. §§ 702, 704. The APA further provides:

> [An] [a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.

5 U.S.C. § 704. To satisfy the finality requirement, two conditions must be met: (i) "the action must mark the 'consummation' of the agency's decision[-]making process"; and (ii) "the action must be one by which rights and obligations have been determined or from which legal consequences flow." *LaMarca*, 34 F. Supp. 3d at 804 (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

In *LaMarca*, the court dismissed the claims asserted against the DOE on the basis, *inter alia*, that the court lacked jurisdiction over the claims. *See id.* at 804-06. The corporations neither alleged that they responded to the PPRs nor that the DOE issued a final program review. *See id.* at 805. The court reasoned that the plaintiffs failed to allege a final agency action for it to review. *See id.*

Similarly in this case, the Complaint does not contain an allegation of any final agency action by the DOE, and the reimbursement requests processed following the filing of this action reflect a lack of final agency action. When the DOE issues a final program review determination, that final agency action will be subject to judicial review pursuant to 34 C.F.R. §§ 668.111-668.124. Because there is no final agency action for this Court to review, this Court lacks jurisdiction over the claims asserted against the DOE under the APA.[6] DOE's motion to dismiss will be granted on this basis.

### 2. 5 U.S.C. § 706

In seeking a declaratory judgment, SCC asserts an all-encompassing claim under 5 U.S.C. § 706 as follows:

> [T]he following acts or omissions were and are agency action unlawfully withheld or unreasonably delayed; arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence; and unwarranted by the facts . . . .

---

[6] The DOE also argues that any claim for monetary damages for breach of contract against the United States would be barred by the Tucker Act, 28 U.S.C. § 1491. Under the Tucker Act, Congress has waived the federal government's sovereign immunity for damages claims in excess of $10,000 based on government contracts. *See* 28 U.S.C. § 1494(a)(1). Jurisdiction for such claims, however, falls under the Court of Federal Claims, not this Court. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1121 (Fed. Cir. 2007); *LaMarca*, 34 F. Supp. 3d at 806 (citations omitted). Based on the Court's review of the Complaint, however, it does not appear that SCC has asserted a claim for breach of contract.

17

(Compl. ¶ 157 (citations omitted).  As outlined below, the Court will also dismiss these claims.

### a. 5 U.S.C. § 706(1)

Under the APA, a party may seek a court order "to *compel* agency action that is 'unlawfully withheld or unreasonably delayed.'" *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 393 (6th Cir. 2013) (quoting 5 U.S.C. § 706(1)).  "However, claims against an agency for a failure to act are available only under limited circumstances; specifically, 'only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is required to take.'" *Id.* (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004)).  *See also Norton*, 542 U.S. at 55 (noting that agency delays or "[f]ailures to act are sometimes remediable under the APA, but not always."); *id.* at 63 ("A 'failure to act' is not the same thing as a 'denial.'  The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request—for example, the failure to promulgate a rule or take some decision by a statutory deadline.  The important point is that a 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action.").  If the DOE allegedly fails to act, that failure does not constitute a denial.  *See Norton*, 542 U.S. at 63.

In this case, however, SCC has failed to identify the legal requirement for any discrete agency action that the DOE was required to take but has failed to do so.[7]  As a result, SCC has failed to state a claim against the DOE under 5 U.S.C. § 706(1).

---

[7] SCC's own allegations also undermine its claim under 5 U.S.C. § 706(1).  The Complaint is filled with lengthy and hyperbolic discussion of the numerous interactions between SCC and the DOE prior to this litigation.  SCC has gone to great length to provide significant detail about those interactions.  Such actions, however, undermine any claim of unlawful withholding or unreasonable delay because there was clearly ongoing activity by the DOE relating to the Perkins Loans leading up to the initiation of this lawsuit.  Such interaction between SCC and DOE

18

### b. 5 U.S.C. § 706(2)

Alternatively, SCC argues that even if DOE had taken action on SCC's request, the decision was:

> arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence; and unwarranted by the facts . . . .

(Compl. ¶ 157). This language parrots 5 U.S.C. § 706(2).

Save SCC's conclusory statements in the Complaint, however, it has failed to state a claim under 5 U.S.C. § 706(2). As reflected in the Complaint and SCC's Motion for Preliminary Injunction, SCC's theory of its case has been that the DOE unlawfully delayed or wrongfully withheld funds and requested that the Court direct the DOE to distribute those funds. (Comp. ¶ 157). As the Supreme Court has stated:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 679. As discussed above, SCC has not alleged a final action to which the provisions of 5 U.S.C. § 706(2) would apply. Because SCC's conclusory allegations as to a claim under 5 U.S.C. § 706(2) are not presumed to be true, the Court will dismiss this claim.

---

continued even after the filing of this lawsuit, resulting in the DOE distributing additional funds to SCC. (Def.'s Mem. Supp. Mot. Dismiss 7; Corwin Aff. ¶¶ 17-18, DN 35-2; Order 1, DN 25).

## V. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss (DN 24, 35) are **GRANTED**.

**Greg N. Stivers, Judge**
**United States District Court**
March 21, 2017

cc: counsel of record